Filed 7/1/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CAVALRY SPV I, LLC, | D072299 |
| Plaintiff, Cross-defendant, and Appellant, | (Super. Ct. No. 37-2014-00016933-CU-BC-CTL) |
| v. | |
| SUE WATKINS, | |
| Defendant, Cross-complainant, and Appellant; | |
| CAVALRY PORTFOLIO SERVICES, LLC, | |
| Cross-defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kevin A. Enright, Judge.  Affirmed in part, reversed in part, and remanded for further proceedings.

Gersten Law Group, Ehud Gersten and David A. Stevens for Defendant, Cross-complainant, and Appellant Sue Watkins.

Simmonds & Narita, Tomio B. Narita and Jeffrey A. Topor for Plaintiff, Cross-defendants, and Appellants Cavalry SPV I, LLC and Cavalry Portfolio Services, LLC.

Sue Watkins defaulted on a credit card she opened through Citibank. As is common practice in the industry, Citibank charged off the debt,[1] stopped accruing interest or sending monthly statements, and eventually sold the account to a third party debt collection agency, Cavalry SPV I, LLC (Cavalry). Cavalry then added prejudgment interest from the date of charge-off and attempted to collect the debt through an associated entity, Cavalry Portfolio Services, LLC (CPS). As part of its collection efforts, CPS reported the debt with the additional interest included to several credit reporting agencies.

Watkins disputed the debt and did not pay it, Cavalry sued to collect, and Watkins filed a cross-complaint alleging violations of the Rosenthal Fair Debt Collection Practices Act (the Rosenthal Act; Civ. Code, § 1788 et seq.)[2] and other associated statutes governing debt collection practices. The superior court conducted a bench trial, rejected the claims in Watkins's cross-complaint, and entered a judgment in favor of Cavalry in the amount of the original debt, plus attorney fees. After the parties submitted additional briefing regarding the fees, the court awarded approximately one-half of the amount Cavalry requested.

---

[1]     When a creditor charges off a debt, the creditor declares the debt is unlikely to be collected and takes a tax deduction on the debt. (*Frost v. Resurgent Capital Servs., L.P.* (N.D.Cal., June 27, 2016, No. 5:15-cv-03987-EJD) 2016 U.S.Dist. Lexis 83317 at p. *1 (*Frost*); see 35A Am. Jur. 2d Fed. Taxation, par. 17126.) This typically occurs after six months of nonpayment by the debtor. (*Frost*, at p. *1, fn. 1.) Although it has been deemed uncollectible by the original creditor, the debt remains legally valid after a charge-off. (*Ibid.*)

[2]     All further statutory references are to the Civil Code unless otherwise stated.

On appeal, Watkins asserts the superior court erred by finding her liable for the original debt, denying the claims in her cross-complaint, and awarding Cavalry attorney fees. In their cross-appeal, Cavalry and CPS contend the superior court erred by reducing the attorney fees award. We conclude the superior court correctly determined that Watkins was liable for the original debt. With respect to the cross-complaint, we determine that Cavalry and the court relied on an inaccurate interpretation of section 3289, subdivision (b) to support the accrual of statutory prejudgment interest, but the superior court's denial of the counterclaims was nevertheless proper as Cavalry could have accrued such interest pursuant to section 3289, subdivision (a). Finally, we decide the superior court erred by awarding Cavalry and CPS attorney fees related to the defense of counterclaims. We therefore reverse the judgment as to the fees and remand the case to the superior court for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL HISTORY

In 2002, Citibank sent Watkins a promotional offer for a Citgo gas station credit card. After Watkins filled out the application and returned it, Citibank sent her a credit card, along with written terms and conditions governing use of the card. Watkins used the credit card regularly and made monthly payments on the account for several years.

In 2004, Watkins paid off the entire balance on the account. But she continued to use the card, accruing additional balances and, in August 2007, she took out a cash advance of $1,400. She made a payment of $150 the month after the advance and then stopped using the card, but continued to make smaller payments, slowly reducing the balance.

Between 2008 and 2009, while Watkins was still making regular payments on the account, Citibank sent Watkins three separate "Notice of Change in Terms and Right to Opt Out" documents. Citibank informed her of one such notice in her January 2009 statement by including a statement in bold print and capital letters that read, "**PLEASE SEE THE ENCLOSED NOTICE OF CHANGE IN TERMS FOR IMPORTANT INFORMATION**."

In 2010, Watkins stopped making payments on the account despite an outstanding balance of approximately $1,200. Citibank continued to accrue finance charges and interest over the next six months, sending Watkins regular statements during that time showing the additional fees and interest.

On March 6, 2011, having received no further payments, Citibank charged off the account. It sent Watkins a final statement in March 2011. There were no further monthly statements and Citibank stopped accruing interest. The account balance at the time of charge-off was $1,603.22. Although it was no longer sending statements to her, Citibank did send Watkins an additional amended card agreement in 2011, after the account was charged off.

In August 2012, Citibank sold Watkins's account to Cavalry, a major buyer of bad debt, along with numerous other delinquent accounts. At the time of sale, Citibank listed the balance on the account as $1,603.22, the same amount as when Citibank originally charged off the account in March 2011. After purchasing the debt, Cavalry added prejudgment interest from the date of the charge-off at a rate of 7 percent. Cavalry

4

believed at the time that adding interest at this rate was permissible under California law because the 7 percent rate was below the state statutory rate of 10 percent.

*Collection Efforts*

Following its purchase of Watkins's account, Cavalry attempted to collect the debt through CPS, an associated entity. On September 7, 2012, CPS sent Watkins a letter informing her that Cavalry had purchased the account and referred it to CPS for servicing. The letter stated that the account balance was $1,772.32, and that it was continuing to accrue interest, but did not provide any details as to the interest rate or amount of interest already accrued. The letter added that "[u]nless you notify Cavalry within thirty days after receiving this letter that you dispute the validity of this debt or any portion thereof, Cavalry will assume this debt is valid."

That same month, CPS began reporting the debt to the various credit reporting agencies, including the prejudgment interest it had added to the account balance. In November, CPS sent Watkins another letter listing the account balance as $1,794.15 and offering up to a 20 percent discount if she paid the debt within 30 days. Again, the letter did not provide any details regarding the interest rate, and did not break down the outstanding balance or otherwise indicate the amount of interest already accrued.

In February 2013, Cavalry conducted a risk assessment with their in-house and external counsel and, as a result, changed its policy to freeze the accrual of interest on accounts (like Watkins's) that had been placed with CPS for collection. Accordingly, Watkins's account balance was frozen at $1,809.22. CPS sent Watkins two more letters, in June and August 2013; each listed the account balance as $1,809.22, and each offered

5

a 40 percent "**INSTANT DISCOUNT**."  The letters also informed Watkins that CPS had told a credit bureau about a late payment, missed payment, or other default on the account, and that such information might be reflected on her credit report.  Additional letters in October and December 2013 continued to list the balance at $1,809.22, but offered only 30 percent and 20 percent "**INSTANT DISCOUNT[S]**," respectively.  None of the letters provided any information about the interest rate or amount of interest accrued and Watkins did not respond to any of these letters.

In 2013, Cavalry conducted another risk assessment, again with internal and external counsel, and as a result changed its policy to collect only the original charge-off balance on accounts that had been placed with a collection attorney.  However, Cavalry continued reporting the balance as $1,809 to the credit agencies through the end of November 2014.  Thereafter, CPS reported a balance of $1,603 on Watkins's account.

Around the same time, Cavalry referred Watkins's account to the law firm of Lang, Richert & Patch (Lang).  On March 14, 2014, Lang sent Watkins a letter informing her that they had been retained by Cavalry to collect the outstanding account balance of $1,603.22.  The letter did not explain why the balance had been reduced, but did inform Watkins that:  (1) she had 30 days to dispute the validity of the debt; (2) Lang would provide verification of the debt if requested within the 30-day period; and (3) thereafter, Lang would be entitled to file a lawsuit against her for the collection of the debt, along with associated attorney fees and costs.

On March 18, 2014, Watkins responded via letter formally disputing the debt and requesting notice of "the date that this alleged debt was purchased by Cavalry" and "the

6

date this alleged debt became a charged-off account by Citibank." She also sent a second letter on April 1, 2014, stating, "I dispute this alleged Citgo debt." Lang responded via letter on April 23, 2014, and provided a copy of the charge-off statement from Citibank and certain documents related to the sale and assignment of certain accounts from Citibank to Calgary. In addition, as of April 14, 2014, CPS reported to the credit agencies that the debt was disputed.

On May 5, 2014, Watkins wrote separately to Citibank and requested information regarding the sale and assignment of her account, including "a true and correct copy of the Bill of Sale and Assignment from Citgo and, a copy of the final Citgo statement for this account." Citibank did not respond to this letter.

*Complaint and Cross-complaint*

On May 27, 2014, Lang filed a complaint against Watkins on behalf of Cavalry. The complaint alleged breach of contract and common counts and sought damages in the amount of $1,603.22, plus attorney fees according to proof. It did not seek interest on the alleged damages. In response, Watkins filed a cross-complaint, and later a first amended cross-complaint, alleging that Cavalry and CPS violated the Rosenthal Act, the Consumer Credit Reporting Act (CCRA; § 1785.25, subd. (a)), and the Fair Debt Buying Practices Act (FDBPA; § 1788.50 et seq.)[3] by, among other things, "falsely representing the character, amount, or legal status of the alleged debt," "failing to verify that the amount

---

[3]    The FDBPA claims were later dismissed on summary adjudication because the FDBPA only applies to consumer debts sold on or after January 1, 2014. Cavalry purchased Watkins's account in August 2012, rendering the FDBPA inapplicable.

7

demanded was accurate," and "failing to provide an accurate accounting of the alleged debt."

In September 2015, while the litigation was pending, Watkins sent a letter to CPS disputing the accuracy of the information CPS was reporting to the credit bureaus and stating, "I believe that this account does not belong to me." The letter demanded substantiating documentation proving Watkins owned the alleged account and reported debt. When CPS did not respond, Watkins sent a second notice on November 11, 2015, making essentially the same complaints and demands.

In April 2016, CPS sent Watkins's attorney a letter including verification of the debt. However, due to an accounting error, the letter stated the principal due was only $687.73.[4]

Through discovery, Watkins learned that CPS had reported the alleged debt to the credit agencies through April 2016, and had included post charge-off interest in the reported account balances prior to the various policy changes. As Watkins now believed there were as many as 408 reporting violations—and because she was potentially entitled to statutory damages of up to $5,000 for each violation—she moved to reclassify the case as unlimited. The court granted the motion in October 2016.

---

[4]     At trial, a Cavalry employee explained that when Cavalry agreed to pay the travel expenses of a witness from Citibank related to a deposition in the case, the payment was misapplied as a payment to Watkins's account, thereby resulting in the artificially reduced account balance.

8

*Statement of Decision*

Following a bench trial, the superior court issued a written statement of decision (SOD). It concluded that Watkins entered into a contract with Citibank when she filled out the credit card application, received the card along with written terms, and then used the card. Watkins raised a statute of limitations defense, but the court concluded that a four-year statute of limitations applied since the claims were based on a writing, and Cavalry's lawsuit was filed within the four-year period. Accordingly, the court awarded Cavalry $1,603.22, plus attorney fees and costs on the contract claim.

Regarding the cross-complaint, the superior court determined that the debt was a consumer debt, CPS was a debt collector within the meaning of the Rosenthal Act, and Cavalry was vicariously liable for the actions of CPS. The court concluded, however, that Watkins failed to meet her burden to prove Cavalry or CPS violated the Rosenthal Act or the CCRA. Specifically, it found that the terms and conditions of the contract and section 3287, subdivision (a) allowed interest to accrue on the past due amount and, Cavalry, "as owner of the debt, could therefore choose to charge interest from the charge-off date as it did." The court went on to explain that "[b]y choice, interest accrued at 7%, below the allowable 10%, and thereafter ceased accruing." It added that "Citibank's decision not to seek interest on the charge-off balance did not act as a waiver" of Cavalry's ability to do so. Similarly, regarding the CCRA, the court concluded that Watkins failed to prove CPS knew or should have known that it provided inaccurate information to the credit reporting agencies.

9

In posttrial proceedings, Cavalry sought attorney fees. The superior court found the fees provision in the updated terms governing Watkins's use of the credit card—which stated in part, "[t]o the extent permitted by law, you are liable to us for our legal costs if we refer collection of your account to [a] lawyer who is not our salaried employee"—was broad enough to permit fees related to both Cavalry's complaint and Watkins's cross-complaint. However, the court also determined that the matter was over litigated and therefore reduced the fees Cavalry requested by 50 percent, ultimately awarding $134,604.86.

DISCUSSION

I. *Watkins Is Liable for the Debt*

Watkins asserts the superior court erred by finding her liable for the $1,603.22 due on the account under either a breach of contract or open book account theory. We disagree.

A. *Breach of Contract*

Turning first to the breach of contract claim, Watkins contends Cavalry failed to prove the existence of a *written* contract and, therefore, the statute of limitations had expired when Cavalry filed its complaint. In California, the statute of limitations is four years for a breach of contract claim based on a written contract, but only two years for a breach of contract claim based on an oral agreement. (Code Civ. Proc., §§ 337, 339.) Watkins made her last payment in July 2010, and Cavalry filed its complaint in May 2014, so the complaint was within the statute of limitations only if the four-year period applied.

10

Assuming without deciding that California law applies,[5] a party may accept a contract by conduct, as well as by words, and parties to a written contract may modify the contract through an additional writing. (§ 1698; *Russell v. Union Oil Co.* (1970) 7 Cal.App.3d 110, 114 (*Russell*).) Accordingly, a credit card company may modify the terms of a written contract by sending new or additional terms to the cardholder and stating that the cardholder's continued use of the card constitutes acceptance of those terms. (See *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094 [concluding an amended cardholder agreement in the form of a "bill stuffer" accepted by the cardholder's continued use of the credit card is a generally enforceable adhesion contract]; *Meyers v. Guarantee Sav. & Loan Assn.* (1978) 79 Cal.App.3d 307, 312 [adhesion contracts generally enforceable absent other factors].)

Here, Citibank enclosed a written agreement when it first sent Watkins the credit card and then modified the applicable terms in writing several times thereafter. Watkins testified at trial that she filled out, signed, and mailed in a Citibank credit card application and that she received a Citgo gas station credit card issued by Citibank in return. Although Citibank was unable to produce the original written agreement it sent to Watkins, a Citibank representative testified that Citibank's regular practice was to provide a copy of the terms and conditions governing the use of the card along with the card, and that the agreement would have stated that use of the card constituted acceptance of those

---

5     Watkins relies solely on California law in her briefing. Cavalry alleges the contract contained a choice of law provision that requires application of South Dakota law, but also asserts the outcome would be the same regardless of which law is applied. (See 1983 S.D. Codified Laws, § 54-11-9.)

terms. Watkins used the Citgo credit card numerous times over the next several years, thereby accepting the written terms that accompanied the original credit card. (*Russell, supra,* 7 Cal.App.3d at p. 114.)

Watkins contends Citibank could not rely on the original written agreement given its inability to produce a copy at trial, but even if that were the case, Citibank also sent Watkins several written "Notice of Change in Terms and Right to Opt Out" documents over the years, as well as a written amended card agreement in 2011. (Boldface omitted.) Each of the 2008 and 2009 notices stated that Watkins "must call or write" by a certain date to opt out of the new terms, but Watkins never contacted Citibank to do so. Instead, she continued to make payments to her account. Through her conduct, Watkins accepted the updated terms, creating an enforceable written agreement in each context. (§ 1698; *Russell, supra,* 7 Cal.App.3d at p. 114.)

Moreover, Citibank also sent Watkins an amended card agreement in 2011 that stated, "[t]his Card Agreement is your contract with us," "[i]t governs the use of your card and account," "[y]ou agree to use your account in accordance with this Agreement," and "[t]his Agreement is binding on you unless you close your account within 30 days after receiving the card and you have not used or authorized use of the card." Again, Watkins took no action in response. Watkins argues her account was already closed when she received the amended agreement in 2011 and, therefore, the new agreement was not binding on her. Again, even if we accept this argument, the earlier change-in-terms documents sent in 2008 and 2009, establish the existence of a written agreement.

12

Thus, while there may be some dispute regarding exactly which terms governed, the evidence does establish the existence of a written agreement between the parties. Accordingly, Cavalry timely filed its complaint in accordance with the four-year statute of limitations.  (Code Civ. Proc., § 337.)

B.  *Common Count*

Watkins also asserts that Citibank did not meet its burden to prove liability under the common count.  Technically, we need not address this argument given our conclusion that the superior court correctly concluded that the four-year statute of limitations applied to the breach of contract claim.  Regardless, we also find no error in the superior court's conclusions regarding the common count.

Under common law in California, a creditor may establish that a debtor owes it money on an "open book account" by providing evidence of a " ' "detailed statement, kept in a book, in the nature of debit and credit, arising out of contract or some fiduciary relation." ' "  (*Interstate Group Administrators, Inc. v. Cravens, Dargan & Co.* (1985) 174 Cal.App.3d 700, 708 (*Interstate*).)  Where such a record exists, the court can determine the amount owed by computing all credits and debits entered in the book account.  (*Ibid.*)

Watkins asserts that the court could not make such a calculation because certain statements issued prior to February 2004 were missing.  However, the statement from February 2004 is in evidence and shows a previous balance of zero, such that the statements thereafter offered a full accounting of the balance from that point forward, including the ending balance.  Watkins claims there could have been a credit prior to the

13

zero balance in February 2004 that was not carried forward, and which would have affected the later balance. But she offered no evidence of any such credit, the December 2003 statement showed a balance of over $200, and she never disputed the balance on any of the monthly statements she subsequently received between 2004 and 2010. Accordingly, we agree that Citibank presented sufficient evidence to support the amount due under a common " 'open book account' " theory as well. (See *Interstate, supra,* 174 Cal.App.3d at p. 708.)

II. *Watkins's Counter-claims Under the Rosenthal Act and the CCRA*

Turning to the claims in the cross-complaint, Watkins contends the superior court erred in failing to find that Cavalry violated the Rosenthal Act and the CCRA by improperly reporting and attempting to collect the debt, primarily because Cavalry accrued post charge-off interest that Citibank had previously waived. In response, Cavalry argues the claims must fail because Watkins did not timely and sufficiently plead her waiver theory.[6] Regarding the substantive merit of Watkins's claims, Cavalry initially complains that the debt is not a "consumer debt" and Cavalry is not a "debt collector" as defined by the Rosenthal Act. It further asserts it was entitled to collect the debt as reported because Citibank did not waive its right to collect post charge-off interest, and even if it could not accrue post charge-off interest under the contract, it had a

---

[6]     Cavalry also argues that Watkins's various claims are barred by the applicable statute of limitations. In light of our other conclusions and because the trial court did not find it necessary to address the limitations issue, we assume without deciding that Watkins's claims were timely.

14

right to accrue statutory prejudgment interest at a rate of up to 10 percent pursuant to sections 3287 and 3289.

A.  *Watkins's Claims Were Timely and Sufficiently Pled*

At the outset, Cavalry contends we should not consider Watkins's interest waiver theory because it was not timely and sufficiently pled.  It concedes, however, that Watkins did argue this theory in opposition to Cavalry's motion for summary judgment.  A new factual issue may be presented in conjunction with motions for summary judgment so long as the theory is encompassed by the controlling pleading, construed broadly.  (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1257-1258.)  If the new issue is not encompassed in the original pleading, the trial court should readily allow amendments to the original pleadings.  (*Ibid*.)

Here, the first amended cross-complaint alleged that Watkins "did not believe that she owed Cavalry the amount it claimed," and that Cavalry violated the Rosenthal Act and the CCRA by "falsely representing the character, amount, or legal status of the alleged debt."  Watkins may not have had a full understanding of why the amount that CPS reported continued to fluctuate when she filed the first amended cross-complaint—at least in part because Cavalry did not provide any information regarding the accrual of interest on her account—but her allegation that she did not owe Cavalry the amount it claimed was sufficient to encompass the theory that Cavalry improperly accrued and reported post charge-off interest that Citibank had waived, particularly given the broad construction afforded to pleadings.

15

In any event, Cavalry is not prejudiced by Watkins's raising this theory on appeal given that Watkins raised it squarely in the superior court long before trial. As we later discuss, however, we agree that Watkins did not sufficiently prove waiver at trial.

B. *The Rosenthal Act*

Having concluded that Watkins's claims were timely and sufficiently pled, we now turn our attention to the substance of the claims, beginning with the alleged violations of the Rosenthal Act. The Rosenthal Act "prohibit[s] debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts" and requires all debt collectors to comply with sections 1692b to 1692j of title 15 of the United States Code, commonly referred to as the Fair Debt Collection Practices Act (FDCPA).[7] (§§ 1788.1, 1788.17.)

1. *The Rosenthal Act Applies*

As an initial matter, Cavalry asserts the Rosenthal Act is not applicable because the debt was not a "consumer debt" and Cavalry was not a "debt collector." We are not persuaded by either argument.

a. *The debt is a "consumer debt"*

The Rosenthal Act defines " 'consumer debt' " as "money, property or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction." (§ 1788.2, subd. (f).) It further defines the phrase

---

[7] Both the Rosenthal Act and the FDCPA govern fair debt collection practices. The FDCPA is the federal statute and the Rosenthal Act, which bears a similar name and incorporates portions of the federal FDCPA, is the California State counterpart. (See *Davidson v. Seterus, Inc.* (2018) 21 Cal.App.5th 283, 295.)

16

" 'consumer credit transaction' " as "a transaction between a natural person and another person in which property, services or money is acquired on credit by that natural person from such other person primarily for personal, family, or household purposes." (*Id.*, subd. (e).) The debt at issue here was based on a personal Citgo gasoline credit card and the terms explicitly required that the card be used for consumer purposes only—defined as "personal, family, or household purposes." This fits precisely within the definitions of consumer debt and consumer credit transactions set forth in the Rosenthal Act, and there is no suggestion in the record that Watkins used the card for anything else. Cavalry argues that Watkins failed to prove she did not use the card for nonconsumer purposes but there was no reason to believe that she did so, particularly since the terms expressly prohibited nonconsumer uses. Thus, we agree with the superior court that the debt was a "consumer debt" as defined by the Act.

### b. *Cavalry is a "debt collector"*

Cavalry next contends it is not a debt collector because it has no employees and takes no action to collect on debts, and that Watkins failed to name CPS—the entity that did act—in her Rosenthal Act cause of action. The superior court, however, concluded that Cavalry was vicariously responsible for any improper acts undertaken by CPS with respect to the collection of Watkins's debt. We agree.

The Rosenthal Act defines " 'debt collector' " broadly to include "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection." (§ 1788.2, subd. (c).) Further, a creditor can be held vicariously liable for the actions of an agent collecting a debt on its behalf under the

17

Rosenthal Act. (*Huy Thanh Vo v. Nelson & Kennard* (E.D.Cal. 2013) 931 F.Supp.2d 1080, 1089-1090; *Fox v. Citicorp Credit Servs*. (9th Cir. 1994) 15 F.3d 1507, 1516.) Cavalry's main business is the purchasing and collection of "bad debt." Here, it purchased Watkins's debt with the intent of collecting the balance due. It then used its affiliate, CPS, to do so.

Cavalry relies on *Gold v. Midland Credit Mgmt.* (N.D.Cal. 2015) 82 F.Supp.3d 1064 to argue that a mere debt buyer who retains another company to collect debts does not meet the definition of a "debt collector" under the FDCPA or the Rosenthal Act. *Midland*, however, actually supports the superior court's conclusion in this case. (*Id*. at pp. 1072-1073.) *Midland* was decided in the context of a motion for summary judgment based on the court's conclusion that the debtor (Gold) had not offered any evidence tending to show that the debt buyer (Midland) was involved, directly or indirectly, in debt collection beyond Midland's acknowledgement that it was in the business of purchasing defaulted consumer accounts. (*Id*. at p. 1071.) While this fact alone was not sufficient to establish that Midland was a " 'debt collector' " under the Act, the court acknowledged that a debt holding entity may be a " 'debt collector' " if it indirectly collects debts through a separate entity where the two entities together form an interdependent "single economic enterprise." (*Id*. at p. 1072, citing *Jenkins v. Union Corp.* (N.D.Ill. 1998) 999 F.Supp. 1120, 1143.)

Here, there was ample evidence to suggest that Cavalry and CPS formed the type of " 'single economic enterprise' " discussed in *Midland*. (See *Midland, supra,* 82 F.Supp.3d at p. 1072.) Cavalry and CPS operated under common ownership and

18

pursuant to a servicing and managing agreement under which debts purchased by Cavalry were routinely placed with CPS for collection immediately upon purchase. Anne Thomas, the designated witness for Cavalry, acted as chief compliance officer for both Cavalry and CPS, and testified at trial that it was Cavalry's policy to accrue post charge-off interest at the state rate and to report that interest to the credit reporting agencies. Thus, the evidence demonstrates that Cavalry and CPS were closely related, CPS was acting under the direction of Cavalry, and Cavalry itself set the allegedly improper policy and practice of accruing and reporting post charge-off interest at the statutory rate, which forms the basis of Watkins's claim under the Rosenthal Act.

Moreover, the Lang firm also sent letters on behalf of Cavalry attempting to collect the debt and threatening to take legal action if Watkins did not pay. It then filed the lawsuit against Watkins from which this appeal arises on behalf of Cavalry. Thus, Cavalry was involved in debt collection efforts, is itself a debt collector, and cannot escape liability under the Rosenthal Act simply because it used a legally separate but closely associated entity to contact debtors on its behalf.

2. *Cavalry Did Not Violate the Rosenthal Act by Accruing or Reporting Statutory Prejudgment Interest on the Debt*

Section 1692f(1) of title 15 of the United States Code, FDCPA precludes the collection of any amount, including interest, that is not expressly authorized by the agreement creating the debt or otherwise permitted by law. Watkins asserts that Cavalry violated this section of the FDCPA, and thus the Rosenthal Act, by accruing, reporting, and attempting to collect post charge-off prejudgment interest. She argues that post

19

charge-off interest was uncollectible because Citibank had waived its right—and thus Cavalry's right—to that interest by failing to accrue it during the post charge-off period.[8] Cavalry responds that Citibank did not waive its right to interest and that it had an independent right to accrue statutory prejudgment interest at a rate of up to 10 percent pursuant to sections 3287 and 3289.

a.  *Watkins did not prove waiver*

When a bank assigns a debt to a debt collector, the debt collector "undisputedly step[s] into the shoes of their respective assignors . . . taking that debt subject to any existing waivers or defenses."  (*Terech v. First Resolution Mgmt. Corp.* (N.D.Ill. 2012) 854 F.Supp.2d 537, 541 (*Terech*).)  Accordingly, any action of Citibank constituting a waiver of the right to accrue interest applied equally to Cavalry once it purchased Watkins's account.

Pursuant to California law,[9] " ' "[w]aiver is the intentional relinquishment of a known right after knowledge of the facts." ' "  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.)  A waiver can be expressly stated or implied by conduct, but the party

---

8    Watkins also alleges Cavalry and CPS violated the CCRA for the same reason, among others, and we address those claims in the following section.  However, in the CCRA section of her opening brief, Watkins also asserts Cavalry violated title 15 United States Code section 1692(e) of the FDCPA, which precludes a debt collector from using any false, deceptive or misleading representation in the collection of a debt.  If anything, this would be a violation of the Rosenthal Act and not the CCRA, but, for the same reasons we discuss with respect to title 15 United States Code section 1692(f), Cavalry's inclusion of prejudgment interest in the account balance was not misleading in the context of title 15 United States Code section 1692(e).

9    We again assume without deciding that California law applies, because Watkins argues her position only under California law and Cavalry asserts the outcome would be the same under either California or South Dakota law.

alleging a waiver has the burden of proving it by clear and convincing evidence. (*Ibid*.) Whether a party waived a right is a question of fact and, accordingly, we will not reverse the superior court's finding so long as it is supported by sufficient evidence. (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196.)

Watkins contends Citibank waived its right to interest by failing to send her monthly statements and by failing to accrue interest between the time it charged off the account and the time it sold the account to Cavalry. In deciding a motion to dismiss for failure to state a claim (Fed. Rules Civ. Proc., rule 12(b)(6)), the court in *Terech, supra,* 854 F.Supp.2d 537 considered whether two similar allegations were sufficient to support the plaintiff's claim that the creditor in that case, U.S. Bank, had waived its right to collect interest on the account at issue there. Accordingly, *Terech*'s discussion of the relevant legal principles is instructive here. (*Terech*, at p. 541.)

First, regarding the failure to send statements, the Truth in Lending Act, states that "[a] periodic statement need not be sent for an account if the creditor deems it uncollectible, if delinquency collection proceedings have been instituted, if the creditor has charged off the account in accordance with loan-loss provisions and will not charge any additional fees or interest on the account, *or* if furnishing the statement would violate federal law." (12 C.F.R., § 226.5(b)(2)(i) (Jan. 10, 2018), italics and boldface added.) Although a previous version of the statute had been in place during the relevant underlying events in *Terech*, the court analyzed the statute, including the recent amendment, and concluded a creditor's failure to send statements was not evidence of waiver because once the bank deemed the account uncollectible, it no longer had an

21

obligation to send regular statements, even if it had not waived the right to accrue interest. (*Terech*, *supra*, 854 F.Supp.2d at pp. 542-543.)

The same is true under the current statute applicable here—the "or" indicates that Citibank's decision to treat the account as uncollectible provided an independent basis to stop sending statements even if Citibank had not waived its right to accrue interest. (See 12 C.F.R., § 226.5(b)(2)(i) (Jan. 10, 2018).) Moreover, Citibank expressly informed Watkins in each set of terms that it could continue to add interest to the account even if it stopped sending statements after deeming the account uncollectible. Thus, the fact that Citibank stopped sending regular monthly statements after it deemed the account uncollectible and charged it off does not, itself, establish that Citibank waived its right to post charge-off interest.

*Terech* went on to conclude that the complaint was sufficient to support a claim of waiver based on the allegation that the face value of the debt remained the same on the date of sale as on the date of charge-off. (*Terech, supra,* 854 F.Supp.2d at p. 542; see also *Simkus v. Cavalry Portfolio Servs., LLC* (N.D.Ill. 2014) 12 F.Supp.3d 1103, 1107-1110 [concluding allegation that credit card company did not charge interest for period between charge-off and sale of debt was sufficient to raise factual issue regarding waiver of interest].) In reaching that conclusion, the court noted that the important question was not simply whether the balance reported by U.S. Bank remained the same, but how the bank actually handled the account. In particular, it was specifically alleged that U.S. Bank had a policy or practice of waiving interest, which the plaintiff claimed banks frequently did for the purpose of minimizing the "bad debt" on their books. (*Terech,*

22

*supra,* 854 F.Supp.2d at p. 542; accord *McDonald v. Asset Acceptance LLC* (E.D.Mich. 2013) 296 F.R.D. 513, 525, subsequently vacated by *McDonald v. Asset Acceptance, LLC* (E.D.Mich. 2016) 2016 U.S. Dist. Lexis 102181 (*McDonald*) [finding waiver where bank representative testified bank's policy was to stop adding interest to charged off accounts to preclude incurring additional associated costs].)

As in *Terech*, Citibank reported the balance on Watkins's account as the same on the charge-off statement as it did on the date of sale to Cavalry. But the different procedural posture of *Terech* is significant. Because it was addressing a motion to dismiss, the district court's decision was based on the *allegations of the complaint*. Here, in contrast, we must evaluate the evidence actually presented at trial in light of Watkins's burden to prove waiver. Although a representative from Citibank testified at trial, Watkins presented essentially no evidence regarding any decision by Citibank regarding the handling of her account after charge-off or of a policy or practice at Citibank to routinely waive interest on post charge-off debts.[10] (Cf. *Terech, supra,* 854 F.Supp.2d at p. 542.) Thus, although the records indicate Citibank did not accrue interest on Watkins's account after charge-off, we agree with Cavalry that the superior court could properly

_____

[10] The Citibank witness testified that the bank "sometimes" charged interest on charged-off accounts and that the balance was the same on Watkins's account when sold as it was at charge-off, but that he did not know why the bank had not added interest to Watkins's account after it was charged-off.

find Watkins did not prove Citibank knowingly or intentionally waived its right to post charge-off interest.[11]

b. *Section 3289, subdivision (a) did not provide Cavalry with an independent basis to accrue statutory prejudgment interest on the account*

The waiver analysis does not end our inquiry because Cavalry expressly asserts that it did not seek interest pursuant to the contract. Instead, it claims to have accrued statutory prejudgment interest in reliance on sections 3287 and 3289, subdivision (b). Watkins responds that Cavalry was not entitled to statutory prejudgment interest because Cavalry's damages were not certain or capable of being made certain at the time Cavalry accrued and reported the interest as required by section 3287. In our view, both parties misinterpret the relevant statutes.

Section 3287 provides that a "person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day." A creditor is entitled to assess prejudgment interest pursuant to section 3287 (and §

_____

[11]    Watkins contends that *McDonald*, in which the court did find waiver, is instructive here because the terms of the purchase and sale agreement (PSA) between Citibank and Calgary contained terms similar to those in *McDonald*. As noted, however, the decision in *McDonald* was subsequently vacated and thus is not a persuasive authority. (See *McDonald*, *supra*, 296 F.R.D. 513.) In any event, the court in *McDonald* did not rely on the terms of the PSA alone to find waiver, but instead referred as well to the undisputed testimony of company representatives confirming that the original creditors "took decisive and unequivocal acts to forgo the imposition of interest for strategic business reasons." (See *id.* at p. 525.) Watkins presented no similar evidence in this case; neither does she identify any term in the PSA between Citibank and Cavalry expressly stating or otherwise independently establishing a waiver of post charge-off interest.

24

3289, subd. (b)) when it sends a collection letter, so long as the debt in question is certain or capable of being made certain, and even if the creditor has not yet obtained a judgment. (*Diaz v. Kubler Corp.* (9th Cir. 2015) 785 F.3d 1326, 1329 (*Diaz*).) Damages are certain or capable of being made certain when " 'there is essentially no dispute between the parties concerning the basis of computation of damages *if* any are recoverable . . . .' " (*Ibid.*, italics added.) A creditor need not definitely establish liability to pay the damages, so long as the amount at issue can be calculated based on uncontested evidence. (*Ibid.*)

Section 3289 sets forth the chargeable rates of interest following a breach of contract. Subdivision (a) states that "[a]ny legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation." Subdivision (b) further provides that "[i]f a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach." (§ 3289.) In *Diaz*, the court found the 10 percent rate set forth in section 3289, subdivision (b) was applicable "*given the absence of any provision in the contract stipulating to a particular rate of interest.*" (*Diaz*, *supra*, 785 F.3d at p. 1330, italics added.)

As an initial matter, we disagree with Watkins regarding the certainty of the debt. Cavalry presented monthly statements sufficient to establish the account balance and Watkins concedes she made several payments after receiving those statements. Thus, while there may have been some dispute as to her *liability* for the debt, the amount at

issue could be calculated based on uncontested evidence and was sufficiently certain in the context of section 3287.

Regardless, unlike the contract at issue in *Diaz*, the contract here *did* set forth a contractual rate of interest. Thus, the real question we must address is, if the contract sets forth a legal rate of interest, can the creditor ignore the contract interest provision and instead choose to collect prejudgment interest at the statutory rate set forth in section 3289, subdivision (b)?[12]

Although this appears to be a question of first impression in California, several other courts have addressed similar questions based on similar statutes in other states. In *Stratton v. Portfolio Recovery Assocs., LLC* (6th Cir. 2014) 770 F.3d 443, the court examined a Kentucky statute that set a legal rate of interest at 8 percent but also stated that parties who have entered into a contract that specifies a rate of interest " 'shall be bound for such rate of interest as is expressed in any such contract . . . and no law of this state prescribing or limiting interest rates shall apply to any such agreement or to any charges which pertain thereto or in connection therewith. . . .' " (*Id.* at p. 447 [analyzing a previous version of Ky. Rev. Stat. § 360.010(1)].) The *Stratton* court concluded that the Kentucky statute precluded *any* recovery of statutory interest where the contract specified a legal rate of interest because, pursuant to the statute, a party that agreed to a contractual rate of interest gave up its right to collect interest under any other provision of the law.

---

12    Because Cavalry's briefs relied on section 3289, subdivision (b) as an independent basis for accruing interest at a rate of up to 10 percent, we asked the parties for supplemental briefing addressing whether a creditor can independently rely on the statutory interest rate when the contract between the parties specifies a rate of interest.

26

(*Id.* at p. 448; but see *Stratton v. Portfolio Recovery Assocs., LLC* (6th Cir. 2017) 706 Fed.Appx. 840, 846 [later concluding Utah choice-of-law provision in the credit card agreement applied to debtor's FDCPA claim under Kentucky law].)

Two years later, the court in *Haney v. Portfolio Recovery Assocs., L.L.C.* (8th Cir. 2016) 895 F.3d 974 (*Haney*) distinguished *Stratton* and concluded that the language of a Missouri statute was not as limiting as the language in the Kentucky statute. (*Id.* at p. 984.) The relevant Missouri statute provided that " 'Creditors shall be allowed to receive interest at a rate of 9 percent per annum, *when no other rate is agreed upon*, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and payment is made.' " (Mo. Rev. Stat., § 408.020, italics added; *Haney,* at p. 984.) *Haney* observed that the Missouri statute "states the statutory rate of 9 percent is available 'when no other rate is agreed upon[]' " but "does not state the 9 percent rate otherwise becomes unavailable if a party contracts for a higher rate but subsequently waives that higher rate." (*Haney,* at p. 984, citation omitted.) The court then opined, "[a]lthough it may be reasonable to conclude such interest falls away and becomes unavailable if parties contract for a higher rate, such a reading is by no means compelled," and ultimately concluded the creditor did not violate the FDCPA by accruing prejudgment interest at the statutory rate. (*Id.* at pp. 984, 985.)

Finally, in *Unifund CCR Partners v. Harrell* (Ky. 2017) 509 S.W.3d 25, the Supreme Court of Kentucky followed the reasoning in *Stratton* and found that a creditor gave up its right to collect interest under Kentucky Revised Statutes, section 360.010(1), when it contracted at a different rate such that a purchaser of the debt could not later

27

charge statutory interest.  (*Unifund*, at pp. 28-30.)  The court in *Unifund* also distinguished decisions from Kansas, Missouri, and Washington that reached the opposite conclusion by pointing out that the relevant statutes in those states did not contain the same " 'shall be bound' " language as the Kentucky statute.  (*Id*. at p. 30.)

With these authorities in mind, we turn to the construction of section 3289.  In accordance with the principles of statutory construction under California law, we first examine "the statute's words, giving them their ordinary and usual meaning and viewing them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent."[13]  (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567 (*Gattuso*).)  Moreover, to the extent a statute is ambiguous, we may consider extrinsic evidence, such as the legislative history, and "the consequences of each possible construction and . . . reasonably infer that the enacting legislative body intended an interpretation producing practical and workable results rather than one producing mischief or absurdity."  (*Ibid.*; *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198.)

Section 3289 does not contain the same limiting language—"shall be bound" or "no law of this state prescribing or limiting interest rates shall apply"—found in the Kentucky statute.  However, in contrast to the Missouri statute at issue in *Haney*, section 3289 more clearly differentiates between the interest rate available when the underlying

---

13    In its supplemental brief, Cavalry continues to assert that South Dakota law applies under the contract.  However, as Cavalry relies on a California statute, we interpret that statute pursuant to the customary rules of interpretation under California law.

contract specifies a legal rate of interest, and when it does not. The plain language of section 3289 indicates that subdivision (a) applies when a contract contains a legal rate of interest, and the contractual rate agreed upon by the parties in the contract governs following a breach in such cases. In contrast, section 3289, subdivision (b) applies, permitting the creditor to apply the statutory 10 percent prejudgment interest rate, *if and only if* the contract *does not* stipulate a legal rate of interest. (See *Gattuso, supra,* 42 Cal.4th at p. 567; see also *People v. Arias* (2008) 45 Cal.4th 169, 177 [where a statute is not ambiguous, the plain meaning controls].) Thus, a straightforward reading of the two subdivisions, together in context, indicates that the presence or absence of a legal rate of interest in the underlying contract dictates whether section 3289, subdivision (a) or (b) applies. A creditor may not simply choose between the two provisions. Put another way, if the creditor entered into a contractual agreement containing a legal rate of interest, it remains bound by the terms of that agreement; prejudgment interest at the statutory rate is available only in the absence of an applicable contractual provision.

This interpretation is consistent with the legislative history. A previous version of section 3289, subdivision (b) stated that "[i]f a contract entered into after January 1, 1986, does not specify a legal rate of interest chargeable after a breach, the obligation shall bear interest at a rate of 10 percent." But the statute was amended in 1986, and the "after a breach" language was moved to the end of subdivision (b) so as to provide that if the contract "does not stipulate a legal rate of interest, the obligation shall bear [10 percent] interest . . . after a breach." (Compare Stats. 1985, ch. 663, § 1, p. 2251 with Stats. 1986, ch. 176, § 1, p. 406.) The most reasonable explanation for this change is that the

29

Legislature wished to clarify that it was not necessary for the contract to specify a rate of interest specifically applicable after a breach, and that subdivision (b) only applied if the contract did not include an agreement regarding *any* legal rate of interest.

Further, this interpretation is also consistent with other California cases interpreting section 3289 in slightly different contexts. As already discussed, the Ninth Circuit in *Diaz* addressed a case in which the original contract did not include an interest provision and concluded subdivision (b) was applicable "*given the absence of any provision in the contract stipulating to a particular rate of interest.*"[14] (*Diaz, supra*, 785 F.3d at p. 1330, italics added.) Similarly, in *Mark McDowell Corp. v. LSM* (1989) 214 Cal.App.3d 1427, the court decided that a party to a contract with a usurious interest rate could still collect prejudgment interest at the statutory rate pursuant to section 3289, subdivision (b) because the usurious nature rendered the contractual interest provision void, such that the contract did not specify a *legal* rate of interest. (*McDowell,* at pp. 1431-1432 [abrogated on other grounds by *Southwest Concrete Products v. Gosh Construction Corp*. (1990) 51 Cal.3d 701, 704].) Finally, in *Reidy v. Miller* (1927) 85 Cal.App. 764, 768, the court considered a situation in which the contractual rate of interest was less than the statutory 10 percent and concluded the plaintiff was entitled only to the lower contractual rate. In each of these cases, the presence or absence of a

14     Cavalry also cites *Frost, supra*, 2016 U.S.Dist. Lexis 83317, a more recent California case in which the court relied on *Diaz* to conclude that a debt collector did not violate the FDCPA by charging prejudgment interest. But the court in *Frost* did not address the applicable rate of interest under section 3289 or acknowledge that the contract at issue in *Diaz* did not contain an interest provision. (*Frost*, at pp. *2-*3).

contractual rate of interest controlled whether the creditor could rely on statutory rate of 10 percent set forth in section 3289, subdivision (b).

Finally, the alternative interpretation proffered by Cavalry—allowing a debt buyer to accrue interest at the statutory rate set forth in section 3289, subdivision (a) instead of the contractual rate in subdivision (b)—would be inconsistent with section 1916-2, which precludes a party from accruing compound interest in the absence of a clear written agreement to do so. If the charge-off balance includes previously accrued contract interest and/or finance fees, as it did in the present case, applying the statutory rate of interest set forth in section 3289, subdivision (b) to that entire balance would necessarily result in further compounding of the interest. (See, e.g., *Ninety Five Ten v. Crain* (1991) 231 Cal.App.3d 36, 39-40 [awarding prejudgment interest on a balance that included previously accrued interest would violate the statutory prohibition on compounding interest in the absence of a clear agreement to do so].) If the parties instead rely on the contractual terms—which in the case of credit cards typically allow for compound interest—the issue is avoided, further supporting a construction of section 3289 that requires reliance on the contractual terms agreed upon by the parties when such terms exist.

Here, although the contract at issue specified a legal rate of interest, Cavalry purported to accrue interest based on the statutory rate set forth in section 3289, subdivision (b). While Cavalry portrays this as a consumer-friendly policy, it also benefited Cavalry by allowing it to avoid the burdensome task of determining the specific contract terms governing each individual account. Indeed, the record suggests that

31

Cavalry did not receive a copy of the applicable written terms or agreement when it purchased Watkins's account, such that it may not have been able to determine the exact interest rate that applied under the contract at the time that it first contacted Watkins or started reporting the debt to the various credit reporting agencies.

In the SOD, the superior court found that both the underlying contract and section 3287 allowed interest to accrue on Watkins's account, but made no findings as to what contractual rate of interest—or even specifically which set of terms—applied. Nevertheless, the court concluded that Cavalry could choose to accrue interest at 7 percent, "below the allowable 10%." Although the SOD does not reference section 3289, subdivision (b), the court's reliance on section 3287 and the 10 percent figure does suggest that the court agreed with Cavalry's position that it could apply the statutory rate set forth in section 3289, subdivision (b). As we have discussed, however, that interpretation is inconsistent with the plain language of the statute. Because there was a written contract between the parties that contained a specified rate of interest, section 3289, subdivision (a)—not subdivision (b)—applied.

In its supplemental briefing, Cavalry points out that even if it were restricted to recovering interest under section 3289, subdivision (a), the 7 percent rate it claimed was lower than *both* the statutory interest rate of 10 percent *and* the contractual interest rate such that Watkins has no basis for complaint. Although the superior court did not make a finding as to the specific rate of interest under the contract, the evidence in the record fully supports this conclusion. Each of the updated terms sent in 2008 and 2009 contained interest provisions with interest rates that exceeded 10 percent, and each also

32

allowed for compound interest. Further, the superior court referred to these exhibits when concluding that the terms and conditions of the contract allowed interest to accrue on the past due amount (although it did not specifically identify the controlling agreement or interest rate). Accordingly, while it appears the superior court based its ruling on what we now conclude to be an inaccurate interpretation of section 3289, we nevertheless agree with the court's finding that Cavalry did not improperly accrue or report interest when it applied the 7 percent interest rate to Watkins's account. As a result, the court's ultimate conclusion that Cavalry did not violate the Rosenthal Act was correct.[15]

C. *CCRA Claims*

Watkins also asserts that Cavalry and CPS violated the CCRA by providing false or inaccurate information to the credit reporting agencies, both because the reported amount included post charge-off interest and because Cavalry knew or should have known it reported amounts that it was not entitled to collect.

As part of the CCRA, section 1785.25, subdivision (a) prohibits any "person" from furnishing "information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or

---

[15] Watkins also asserts that Cavalry improperly applied an interest rate in excess of 300 percent. She arrives at this high rate by calculating the amount of interest added over a relatively short period of time from when Cavalry purchased the account to when Cavalry first reported a balance containing interest. However, when Cavalry purchased the debt, it obtained all the rights of Citibank, including the right to assess prejudgment interest from the date of charge-off, and that is what it did. Therefore, the relevant interest rate is properly calculated using the period of time from when Citibank charged-off the debt to when Cavalry first reported the balance. (See *Diaz, supra,* 785 F.3d at p. 1330.)

inaccurate."  The statute applies to entities, like CPS, that report information regarding consumer debts to credit reporting agencies.  (See *Burrell v. DFS Servs., LLC* (D.N.J. 2010) 753 F.Supp.2d 438, 446.)

Here, Watkins did not prove that CPS or Cavalry submitted information they knew or should have known was incomplete or inaccurate.  First and foremost, we have already concluded that Cavalry was entitled to collect the $1,603.22 it sought at trial.  Watkins nevertheless argues that Cavalry knew it could not collect on the debt based on a letter Cavalry sent her attorney on April 28, 2016, that stated, "[b]ecause of the age of your client's debt, we will not sue your client for it."  But when Cavalry sent that letter, it had already sued Watkins for the debt, such that Watkins and her counsel should have known the statement in the letter was made in error.  Moreover, Cavalry had been reporting the debt as disputed since April 2015, before the letter, and stopped reporting the debt altogether in April 2016, after the letter.  Thus, although the letter was somewhat misleading with respect to Cavalry's intent to sue, it does not amount to a violation of the CCRA or any associated statute.

Next, the superior court found that although the reported account balance fluctuated, it never included more than 10 percent interest and, therefore, CPS never reported an amount that exceeded what was actually owed.  As we have already discussed, although we disagree that the 10 percent rate of section 3289, subdivision (b) was applicable in this case, it remains true that Cavalry could charge prejudgment interest at a rate less than the contractual rate, and the 7 percent Cavalry accrued on Watkins's account was lower than the contract rate.  We thus agree with the court that CPS never

34

reported a balance that exceeded the amount it could legally claim. Accordingly, Watkins has not proven Cavalry or CPS violated the CCRA.[16]

III. *Attorney Fees*

Both sides contend that the superior court's order on attorney fees was flawed, although they disagree on the particulars. Watkins argues the court erred by awarding attorney fees related to the defense of her cross-complaint, while Calgary asserts the court erred in reducing the amount of fees it requested.

The question of whether a party is entitled to attorney fees is a purely legal question that we consider de novo. (*Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1016-1017.) We review the appropriateness of the specific amount of fees awarded for an abuse of discretion. (*Id*. at p. 1017.) We presume an order granting or denying a request for fees is correct, indulge all inferences and presumptions to support the order, resolve evidentiary conflicts in favor of the prevailing party, and accept the trial court's resolution of factual disputes. (*Ibid*.)

A. *Watkins Was Bound by the Contractual Fees Provision*

Section 1717, subdivision (a) allows the prevailing party to recover reasonable attorney fees when the contract being enforced specifically provides for such an award. Here, the superior court relied on the "collection costs" provision of the 2011 credit card agreement in awarding fees. Watkins asserts this was an error because she had already closed her account when Citibank sent the 2011 agreement. As we have already

---

16    In light of our conclusion, we need not address Cavalry's alternative argument based on the "bona fide error" defense. (See §§ 1785.25, subd. (g), 1788.30 subd. (e).)

35

concluded, however, while there may be some dispute regarding the applicability of the 2011 agreement, at least the 2008 and 2009 terms were binding on Watkins and those documents each contained the exact same provision. Thus, the fee provision was binding on Watkins regardless of which specific set of terms was controlling.

B. *The Attorney Fee Provision Did Not Extend to Defending the Claims Asserted in the Cross-complaint*

Next, Watkins asserts that the superior court erred by broadly interpreting the attorney fee provision to encompass fees related to the defense of the claims in her cross-complaint.[17] Although section 1717 relates primarily to fees associated with the contract claims, courts have permitted recovery of fees related to associated tort claims where the language of the fee provision is broad enough to encompass such additional fees. (See, e.g., *Cruz v. Ayromloo* (2007) 155 Cal.App.4th 1270 (*Cruz*) and *Thompson v. Miller* (2003) 112 Cal App.4th 327 (*Thompson*).)

Under either California or South Dakota law, contractual agreements regarding attorney fees are valid and subject to the same rules of construction as any other provision. (See *Mountain Air Enterprises, LLC v. Sundowner Towers*, *LLC* (2017) 3 Cal.5th 744, 751-752 [California]; *Credit Collection Services, Inc. v. Pesicka* (2006) 721 N.W.2d 474, 476 [South Dakota]; *Black Hills Excavating Servs. v. Retail Constr. Servs.*

---

17      Cavalry claims that Watkins waived her right to assert the court should have awarded fees only for the contract cause of action and not the claims in the cross-complaint. But Watkins stated in her original opposition that section 1717 only allowed fees related to the contract claim, and that certain fees related to the cross-complaint were "unrelated to the contract issue" and served only to "run up" the overall fees. Thus, Watkins sufficiently preserved the argument for purposes of appellate review.

(2016) 877 N.W.2d 318, 325 [South Dakota].) Pursuant to rules of construction applicable in both states, where there is ambiguity in a written form contract the terms are to be construed against the drafter and in favor of the nondrafter. (*Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 260; *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 248; *Campion v. Parkview Apts.* (S.D. 1999) 588 N.W.2d 897, 904.)

Here, each of the 2008, 2009, and 2011 agreements that potentially governed the account are form agreements drafted by Citibank, and each contained the following provision regarding fees: "**Collection Costs**. To the extent permitted by law, you are liable to us for our legal costs if we refer collection of your account to a lawyer who is not our salaried employee. These costs may include reasonable attorneys' fees. They may also include costs and expenses of any legal action."[18]

We agree with Watkins that this provision is not broad enough to cover fees incurred by Cavalry in defense of the cross-complaint, particularly when construed against Citibank, the drafter. The title of the provision is "collection costs" and the provision allows for the recovery of fees "if we refer collection of your account to a lawyer that is not our employee." A plain reading of the provision indicates it is limited to fees and costs incurred by a nonemployee attorney attempting to collect an outstanding debt. Here, the claims in the cross-complaint primarily involved actions undertaken by Cavalry and CPS, that are not third-party attorneys, before the case was referred to Lang.

---

[18]    This language comes from the 2011 card agreement.

Further, although the last sentence refers to "any legal action," this phrase appears under the heading "collection costs" and, particularly when construed against Citibank, necessarily refers to a legal action *to collect on the account*.

In reaching the opposite conclusion, the superior court relied primarily on *Cruz*, *supra*, 155 Cal.App.4th 1270 and *Thompson, supra*, 112 Cal App.4th 327, in which the courts construed contractual fee provisions broadly enough to include additional claims. We do not find those cases to be instructive. There is no indication the contracts at issue in those cases were adhesion contracts and the provisions at issue broadly allowed for the recovery of fees associated with a " 'civil action . . . instituted *in connection with* this Agreement' " (*Cruz*, at p. 1277) and " 'any dispute under [the] Agreement' " (*Thompson*, at p. 333). (See *Cruz*, at p. 1277 [prevailing party entitled to fees incurred defending tort claims, where lease provided: " 'If civil action is instituted *in connection with* this Agreement, the prevailing party shall be entitled to recover court costs and any reasonable attorney's fees.' "]; *Thompson*, at p. 333 [provision in share purchase agreement stating, " '[t]he prevailing party in any dispute under this Agreement shall be entitled to reasonable attorneys fees incurred in such dispute,' " was broad enough to encompass tort action for fraud].) By contrast, here, the clause at issue appears in a one-sided adhesion contract, which must be construed against Citibank, and is expressly limited by the title to collection costs. (See *MBNA America Bank, N.A. v. Gorman* (2006) 147 Cal.App.4th Supp. 1, 8 [provision allowing fees in " 'any collection proceeding' " limited to a discrete legal proceeding that involves collection of the debt].) Moreover, the court in *Thompson* distinguished between " 'any action' " and " 'any dispute,' "

38

acknowledging that a defense brought as a cross-complaint was not an "action," and the provision at issue here refers to "costs and expenses of any legal action" such that *Thompson* actually supports a narrower interpretation of the Citibank clause. (*Thompson*, at pp. 336, 337.)

Cavalry also relies on several California cases where courts found fee provisions were sufficient to cover cross-claims because defense of the cross-claims was necessarily tied to the plaintiff's ability to prevail on the original complaint. The contract at issue in *Finalco, Inc. v. Roosevelt* (1991) 235 Cal.App.3d 1301 concerned the lease of certain computer equipment and contained a fee provision providing that the " '[m]aker agrees to pay all costs of collection . . . including, without limitation, all attorney's fees and expenses and court costs.' " (*Id*. at p. 1306.) When Roosevelt failed to pay the amount due under the agreement, Finalco sued for breach of contract and Roosevelt filed a cross-complaint alleging fraud, misrepresentation, and various securities laws violations. (*Id*. at p. 1304.) On appeal, the court found the phrase " 'all costs of collection' " was broad enough to support an award of fees related to defense of the cross-complaint because the purpose of the claims in the cross-complaint was to rescind the original contract, and the plaintiff therefore had to defend against the cross-complaint to succeed on the complaint. (*Id.* at p. 1307.)

Similarly in *Calvo Fisher & Jacob LLP v. Lujan* (2015) 234 Cal.App.4th 608 (*Calvo*), the court considered the scope of a fee provision in an engagement letter that read, " '[i]n the unlikely event that we are required to institute legal proceedings to collect fees and costs, the prevailing party would be entitled to a reasonable attorney's fee and

other costs of collection.' " (*Id*. at p. 616.) Relying on *Finalco*, the court concluded the provision was broad enough to encompass fees associated with the defense of claims in a cross-complaint, which included, for example, fraud and unjust enrichment, because, as in *Finalco*, the plaintiff had to defeat those claims to prevail on the original breach of contract claim set forth in the complaint. (*Id*. at pp. 622-624.)

Here, we agree that to recover on its complaint, Cavalry had to prove the debt was valid and that it had purchased all of Citibank's rights under the contract. However, Watkins's claims were broader and included assertions regarding the shifting balance of the account and, specifically, Cavalry and CPS's reporting of the account as having a balance in excess of the amount that Cavalry ultimately claimed Watkins owed. Cavalry's ability to recover did not depend on whether it improperly accrued and reported statutory interest because Cavalry was *no longer* seeking prejudgment interest by the time it filed its complaint. Thus, *Calvo* and *Finalco* are distinguishable and, here, the trial court should have limited the fee award to time spent on efforts necessary to prove the allegations in the complaint. We therefore remand the matter to the superior court for further consideration of the fee award in accordance with our narrower interpretation of the contractual fee provision.[19]

_____

[19]    Cavalry asserts that the broad attorney fees award is proper on a variety of alternative grounds based on its contention that Watkins's claims were frivolous, brought in bad faith, and improperly required it to prove the truth of certain requests for admission that Watkins unreasonably denied. (See Civ. Code, §§ 1788.30, subd. (c), 1785.31, subd. (e); Code Civ. Proc., §§ 128.5 and 2033.420, subd. (a).) The trial court made none of the factual findings necessary to support a fee award on any of these theories, and we decline on appeal to address them in the first instance.

C. *The Court Did Not Err in Reducing the Fees Award for Over Litigation and Duplication of Efforts*

Cavalry argues the superior court erred by reducing the amount of fees awarded based on over litigation and the duplication of efforts. Although we have already concluded the matter must be remanded for a recalculation of the proper amount of attorney fees, we address this independent argument unaffected by our earlier discussion.

The trial court has broad discretion in deciding the amount of reasonable attorney fees to award pursuant to section 1717. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1094-1095.) Trial courts typically use a lodestar calculation to determine the appropriate amount of attorney fees, multiplying the time reasonably spent by the reasonable hourly compensation for each attorney. (*Id*. at pp. 1095-1096.) The court may then adjust the award by taking into account additional factors such as the nature and difficulty of the litigation, the amount in controversy in the case, the skill required and employed in handling the case, and the success or failure of counsel. (*Ibid*.) The trial court is in the best position to determine the value of services rendered during the trial over which it presided and, accordingly, we will not disturb the court's decision regarding the appropriate amount of reasonable attorney fees absent a clear abuse of discretion. (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 148 (*Graciano*).)

Here, the superior court concluded that the number of hours Cavalry submitted were not justified, and accordingly reduced the requested amount. The court noted in its decision that it had counseled the parties at the outset of the litigation not to overestimate the amount of fees the court would award, presumably suggesting a concern that the

parties might be engaging in unreasonable litigation tactics. Regardless, Cavalry continued to aggressively litigate the case. For example, during discovery, it refused to produce the PSA with Citibank, forcing Watkins to file a motion to compel.[20]

Cavalry complains that the trial court did not point out specific instances of duplicated effort or over litigation in its order, but the court was not required to do so. In any event, the court's order referenced the example of numerous conferences among the attorneys included in the time entries Cavalry submitted. Because the judge who presided over the trial was in the best position to make determinations regarding the reasonableness of the time entries submitted, we find no abuse of discretion in the court's decision to reduce the fee award. (See *Graciano, supra,* 144 Cal.App.4th at p. 148.) However, as the superior court awarded fees associated with litigation of both the claims in the complaint and the cross-complaint—and likely considered the over litigation of both in its decision to reduce the overall award—it should reconsider all factors relevant to the fee award on remand.

---

[20]    Watkins points out that Cavalry filed an anti-SLAPP motion against the first amended cross-complaint and several appeals after the motion was denied, as well as a summary judgment motion, which was also denied, as further examples of over litigation. But those filings relate to the defense of claims in the cross-complaint, for which we have now determined Cavalry was not entitled to fees.

42

DISPOSITION

The judgment is affirmed, except as to the award of attorney fees to Cavalry.  As to that award, the matter is remanded to the superior court for reconsideration as specified in part III of this opinion.  The parties shall bear their own costs on appeal.


DATO, J.

WE CONCUR:


IRION, Acting P. J.


GUERRERO, J.